ANTHONY J. ORSHANSKY, Cal. Bar No. 199364
anthony@counselonegroup.com
JUSTIN KACHADOORIAN, Cal. Bar No. 260356
justin@counselonegroup.com
COUNSELONE, P.C.
9301 Wilshire Boulevard, Suite 650
Beverly Hills, California 90210
Telephone: (310) 277-9945
Facsimile: (424) 277-3727

Attorneys for Plaintiff
RICHARD HALL, on behalf of himself and others similarly
situated

# UNITED STATES DISTRICT COURT

## FOR THE NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD HALL, on behalf of himself and others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DIAMOND FOODS, INC., a Delaware corporation, dba KETTLE FOODS, and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 3:14-CV-02148-MMC <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** <br><br> **(1) Unlawful Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.)** <br><br> **(2) Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.)** <br><br> **(3) Fraudulent Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.)** <br><br> **(4) Misleading Advertising (Cal. Bus. & Prof. Code § 17500 et seq.)** <br><br> **(5) Untrue Advertising (Cal. Bus. & Prof. Code § 17500 et seq.)** <br><br> **(6) Violation of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.** <br><br> **(7) Restitution Based on Quasi-Contract / Unjust Enrichment** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

Plaintiff RICHARD HALL (hereinafter "Plaintiff"), on behalf of himself and all others similarly situated, complains of DIAMOND FOODS, INC., a California corporation, dba KETTLE FOODS, and DOES 1 through 50, inclusive, as follows:

**INTRODUCTION**

1. Plaintiff brings this action against Defendants Diamond Foods, Inc. dba Kettle Foods ("Diamond Foods"), and Does 1 through 50, inclusive ("Defendants"), on behalf of all consumers in the United States or, alternatively, California within four years of the filing of this lawsuit who have purchased Defendants' Kettle Brand Chips and/or Tias! tortilla chips ("Misbranded Products").[1]

2. Throughout the class period Defendants have prominently made claims on their product labels that their chip products are "natural or "all natural" or statements of similar import, cultivating a wholesome and healthful image in an effort to promote the sale of these products. Defendants have further promoted this image through their line of "reduced fat" chips.  As a result of these false and misleading statements Defendants were able to sell their chip products to thousands of unsuspecting consumers in California and throughout the United States and to profit handsomely from these transactions.

3. Defendants' representations are false.  Defendants' chip products actually contain synthetic ingredients such as citric acid as well as color additives which a reasonably prudent consumer would not expect natural food products to contain.  Moreover, some of Defendants' "reduced fat" chips are deceptively labeled and marketed because they compare their products to inappropriate reference foods, which is not identified proximate to the principal reduced-fat claim, and are not reduced in fat by the stated amount.

4. Plaintiff alleges that Defendants' conduct violates California's Business and Professions Code sections 17200, et seq. (the Unfair Competition Law, or "UCL"), California's

---

[1]  The Misbranded Products include the products Plaintiff purchased ("Purchased Products"), identified in paragraph 48 below, as well as "Substantially Similar Products," identified in Addendum 1, which is attached hereto. The Substantially Similar Products are identically misbranded products manufactured by Defendants during the class period which (i) make the same label representations, as described herein, as the Purchased Products, (ii) contain the same or similar ingredients as the Purchased Products, and/or (iii) violate the same regulations of the Sherman Food, Drug, & Cosmetic Law, California Health & Safety Code § 109875 (the "Sherman Law") as the Purchased Products herein identified.

1

Business and Professions Code sections 17500, et seq. (the False Advertising Law, or "FAL"), and the Consumers Legal Remedies Act of the California Civil Code sections 1750, et seq. (the "CLRA"). Plaintiff also alleges that Defendants' conduct is grounds for restitution on the basis of quasi-contract/unjust enrichment.

5. Plaintiff seeks damages and restitution stemming from Defendants' false labeling and advertising. Plaintiff also seeks declaratory and injunctive relief to ensure that Defendants remove any and all false or misleading labels and advertisements relating to their chip products and to prevent them from making similar representations in the future as long as the products continue to contain synthetic ingredients, artificial ingredients, or color additives, or do not accurately and lawfully characterize how they are reduced in fat.

**PARTIES**

6. Diamond Foods has its headquarters in Stockton, California, and upon information and belief operates, manages and directs its nationwide sales and business operations from its offices in California. Diamond Foods also maintains manufacturing, storage, and distribution centers in California, from which Diamond Foods operates and directs the majority, or at least a substantial proportion, of its nationwide sales and business operations. It is therefore believed and averred that a substantial portion of the misleading labeling and related misconduct at issue in this Complaint occurred, was conducted and/or was directed and emanated from California, including, but not limited to: (a) the design of the Defendants' packaging; (b) the review, approval and revision of Defendants' products and labeling; (c) the selection and integration of ingredients into the Defendants' products; (d) the distribution of the Defendants' products; and (e) the management and supervision of sales operations to Plaintiff and the putative classes (as defined herein).

7. The true names and capacities, whether individual, corporate, associate, or whatever else, of the defendants sued herein as Does 1 to 50, inclusive, are currently unknown to Plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as Does is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as Does when

2

their identities become known. (As used herein, "Defendants" refers to Diamond Foods and Does 1 to 50, inclusive.)

8. Plaintiff is informed and believes and thereon alleges that each defendant acted in all respects pertinent to this action as the agent of the other Defendants, that Defendants carried out a joint scheme, business plan, or policy in all respects pertinent hereto, and that the acts of each defendant are legally attributable to the other Defendants.

## JURISDICTION

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1441(a) based on 18 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed nationwide class consists of more than 100 members; (ii) at least some class members have a different citizenship from Defendants; and (iii) the claims of the proposed class exceed $5,000,000.00 in the aggregate. [*See* Dkt. 1.]

## BACKGROUND

10. Defendants produce a brand of kettle chips, or "batch-cooked" chips, which are distinct from regular potato chips in the manner of their production and end result. Kettle chips are cooked in batches. When each new batch of potatoes is added to oil, the temperature of the oil drops, so the potatoes take longer to cook, giving the starch in the potatoes time to absorb and dissolve before the potato finishes frying. The result is a thicker, sturdier chip with a caramelized flavor. Regular potato chips are cooked through continuous processing whereby the oil is kept very hot, so the water in the potato evaporates immediately, making the chip light, crispy, and finely textured. Because of the manner in which they are produced, kettle chips are viewed by the consuming public as a throw-back to chips before the advent of mass-processing and thus in some respect more authentic and natural.

11. Defendants have labeled and marketed their chips to appeal to these consumers owing to the recurring representations on the product labels that Kettle Brand chips are "natural" and "all natural" (herein referred to as "Misbranded All-Natural Products"). The front label of each of Defendants' chip products bear the prominent trademarked slogan "great taste…naturally" or state "absolutely nothing artificial" or "all natural potato chips." The back labels assert under the heading "OUR NATURAL PROMISE" that the products contain "No preservatives," "Only all natural

3

colors and flavors," "Non-GMO ingredients," and "Real food ingredients," and are "Made with All Natural Ingredients."  (See photos attached in Addendum 2 hereto.)

12. The back panel contains explanatory text to the same effect.  For example, Defendants' Backyard Barbeque kettle chips state, "The Backyard Barbeque chips have bold flavor and hearty crunch.  [¶]  They taste so great because they are made from all natural, real food ingredients, the finest potatoes, natural oils and craft cooking methods.  [Graphic of wild flowers] [¶]  They are backed by a commitment to sustainability like wind power, solar power, green building and biodiversity.  [¶]  Kettle Brand Potato Chips:  simply great tasting, all natural potato chips made by a company that cares."

13. Furthermore, Defendants market and sell chip products that are labeled "reduced fat" (herein referred to as "Misbranded Reduced Fat Products").  For example, Kettle Brand Reduced Fat Sea Salt Chips features the words "40% reduced fat potato chips" prominently in a green band across the front center of the brown bag.  (See photo attached in Addendum 3 hereto.)

**Defendants' Labeling of the Misbranded Products As "Natural" or "All Natural" (or Words of Similar Import) Is False and/or Deceptive.**

14. Defendants' representations that their products are "natural" or "all natural" (or words of similar import) are false or, at best, deceptive and misleading.  Webster's New World Dictionary defines "natural" as "produced or existing in nature; not artificial or manufactured."[2]  Moreover, "all" is defined as "the whole extent or quantity of[.]"  (*Id.*, "all," definition no. 1 at p. 36.)  Thus the combined use of "all natural" on the labels of the Mislabeled Products indicates to the average reasonable person that "the whole extent or quantity of" the ingredients contained in the food products are "produced or existing in nature; not artificial or manufactured."

15. Although the Food and Drug Administration ("FDA") does not directly regulate the term "natural," the FDA has established a policy defining the outer boundaries of the use of that term by clarifying that a product is not natural if it contains color additives, artificial flavors, or synthetic substances.[3]  Specifically, the FDA states:  "[T]he agency will maintain its policy (Ref.

---

[2] *Webster's New World Dictionary of the American Language*, 2nd College Ed. (Simon & Schuster, 1984), "natural," definition no. 2 at p.947.
[3] *See* http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm094536.htm and http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868.htm

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

32) regarding the use of 'natural,' as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." 58 Fed. Reg. 2302, 2407 (Jan. 6, 2003).

16. This policy is consistent with consumers' understanding of the word "natural." Consumers understand "natural" to exclude synthetic ingredients, food additives, or chemical preservatives. In a 2007 survey conducted by the Natural Marketing Institute the majority of respondents believed that the term "natural" in a product label meant that the product contained 100 percent natural ingredients, no artificial flavors, no artificial colors, no preservatives, no chemicals, and a substantial percentage thought that it meant that the product was not highly processed. Moreover, 81 percent of respondents found products claiming to be "natural" very/somewhat important when purchasing food or beverage products. And large majorities also found that products containing no preservatives, no artificial ingredients, no artificial flavors, and no artificial colors to be very/somewhat important when purchasing food and beverage products. These percentages are even larger among the health-conscious segments of the US population, which are large—approximately 40 percent. What is more, the survey found that these trends have increased from previous years, and consequently the subject labeling statements are probably far more important to consumers today. Significantly, the survey also found that package labeling was by far the most important source of information influencing consumers' purchasing decisions, especially among the health-conscious segment of the population.

17. The labeling of products as "natural" or "all natural" (or words of similar import) carries implicit health benefits important to consumers—benefits that consumers are willing to pay a premium for over comparable products that are not so labeled and marketed. Defendants have cultivated and reinforced a corporate image based on this theme, which they have emblazoned on each and every one of their chip products, despite the fact Defendants use synthetic ingredients. The presence of synthetic ingredients in Defendants' chip products renders their product label advertising false and misleading.

18. Moreover, like the FDA, the United States Department of Agriculture ("USDA"), which regulates the labeling of meat and poultry, has also set limits on the use of the term "natural."

5

The USDA's Food Safety and Inspection Service states that the term "natural" may be used on labeling of meat and poultry products so long as "(1) the product does not contain any artificial flavor or flavorings, color ingredient, or chemical preservative … or any other artificial or synthetic ingredient, and (2) the product and its ingredients are not more than minimally processed."

19. According to the USDA, "[m]inimal processing may include:  (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices."[4]  However, "[r]elatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing."[5]

20. Under USDA policy, a product cannot be labeled as being "natural" if an ingredient would significantly change the character of the product to the point that it could no longer be considered a natural product.  Moreover, any product purporting to be "natural" must conspicuously identify any synthetic ingredients used on the label (e.g., "all natural ingredients except dextrose, modified food starch, etc.").  For example, a "turkey roast" cannot be called a "natural" product if it contains beet coloring but can still bear the statement "all natural ingredients modified by beet coloring."  Defendants do not, however, include any such limiting language on the Misbranded Products.[6]

21. The terms "synthetic" and "artificial" closely resemble each other and in common parlance are taken as synonymous.  The scientific community defines "artificial" as something not found in nature, whereas "synthetic" is defined as something man-made, whether it merely mimics nature or is not found in nature.[7]  In the scientific community, "synthetic" includes substances that

---

[4] *See* the United States Department of Agriculture Food Standards and Labeling Policy book available at http://www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf (last visited December 18, 2013).

[5] *Ibid.*

[6] *Ibid.*

[7] Peter E. Nielsen, *Natural-synthetic-artificial!*, Artificial DNA: PNA & XNA, Volume 1, Issue 1 (July/August/September 2010), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3109441/ (last visited December 18, 2013).

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

are also "artificial," but a synthetic substance also can be artificial or non-artificial.[8]  However, the common understanding of "artificial" resembles the scientific community's definition of "synthetic."  Indeed Webster's New World Dictionary defines "artificial" as "anything made by human work, especially if in intimation of something natural," whereas "synthetic" is defined as "a substance that is produced by chemical synthesis and is used as a substitute for a natural substance which it resembles."[9]

22. Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from a naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes."  7 U.S.C. § 6502(21).  *See also* 7 C.F.R. § 205.2 (defining, in USDA's National Organic Program regulations, a "nonsynthetic" as "a substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process as defined in section 6502(21) of the Act (7 U.S.C. § 6502(21)").

23. The Misbranded Products are unlawfully labeled because, although they purport to be all natural with no artificial flavors or preservatives, the labels themselves disclose the presence of synthetic ingredients, artificial flavors, and color additives such as citric acid, maltodextrin, and paprika extract for color.

24. Citric acid is a highly processed preservative and flavoring that, contrary to popular belief, is typically not fruit-derived and thus not natural but is usually produced from certain strains of the mold *Aspergillus niger*, which is mass produced, and the application of chemical solvents such as sulfuric acid.

25. Similarly, maltodextrin is a highly processed food additive used primarily as a texturizer and filler.  It does not occur in nature.  To produce maltodextrin, acid, enzymes, or acids and enzymes are applied in sequence to a starch slurry to induce partial hydrolysis (saccharification). In other words, the acids or enzymes convert depolymerized starch to glucose or maltose molecules. Once maltose is high enough for maltodextrin, the acids and enzymes are neutralized, removed and

---

[8]  *Ibid.*

[9]  *See* Webster's New World Dictionary of the American Language, 2nd College Ed. (Simon & Schuster, 1984), "artificial," definition SYN at p.79.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

deactivated, and the resulting product is then refined, purified, and concentrated.

26.  Moreover, upon information and belief, the citric acid and maltodextrin used in the Misbranded Products are not natural because they are produced using corn starch made from genetically modified corn, a fact that contradicts Defendants' representations that the Misbranded Products are "natural" and contain "Non-GMO ingredients."  The genetic makeup of GMO plants has been altered by scientists in a lab for the express purpose of causing such plants to exhibit traits that are not naturally their own.  GMOs therefore are not natural by design and are entirely incompatible with Defendants' all-natural representations, as well as Defendants' specific "non-GMO" claims.

27.  Furthermore, the Misbranded Products are not natural because they contain color additives such as paprika extract.   Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.  *See* FDA Compliance Guide CPG Sec. 587.100 ("The use of the words 'food color added,' 'natural color,' or similar words containing the term 'food' or 'natural' may be erroneously interpreted to mean the color is a naturally occurring constituent in the food.  Since all added colors result in an artificially colored food, we would object to the declaration of any added color as 'food' or 'natural.'")

28.  Defendants also unlawfully failed to disclose these chemical preservatives and artificial colors and flavorings in their products.  Defendants place great importance on concealing the fact that their products contain chemical preservatives and artificial colors and flavors.  Indeed Defendants' product labels proclaim the absence of chemical preservatives and artificial colors and flavors.

29.  The falsity of Defendants' statements and labeling claims would be revealed if Defendants complied with the law and disclosed the presence and function of the chemical preservatives and artificial flavors and colors they add as ingredients to their products.  Rather than comply with the law, Defendants have violated the numerous statutory provisions that require that the presence and function of chemical preservatives and artificial flavors to be disclosed on product labels.

///

30. Specifically, Defendants have violated 21 C.F.R. § 101.22, 21 U.S.C. § 343(a), and 21 U.S.C. § 343(k), all of which are adopted by and incorporated into the Sherman Law. A statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food.

31. Pursuant to 21 C.F.R. § 101.22(c), a statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food.

32. Pursuant to 21 C.F.R. § 101.22(j), a food to which a chemical preservative(s) is added shall, except when exempt pursuant to 101.100 bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., "preservative," "to retard spoilage," "a mold inhibitor," "to help protect flavor," or "to promote color retention."

33. The Misbranded Products fail to comply with the requirements of 21 C.F.R. § 101.22. Although they contain citric acid, which functions as a preservative in Defendants' products, the labels of these products fail to describe the function of this chemical preservative thus violating the law and concealing its presence.

34. 21 C.F.R. § 101.22(a)(5) provides that, "The term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

35. Citric acid is not a type of common salt, sugar, vinegar, spice, or oil extracted from spices, nor is it a substance added to food by direct exposure thereof to wood smoke, or a chemical applied for its insecticidal or herbicidal properties. As used by Defendants in its products this chemical prevents or retards deterioration of the products. Therefore citric acid is a "chemical preservative" in Defendants' products, as defined in 21 C.F.R. § 101.22(a)(5).

9

36.  Similarly, Defendants violated the requirement of 21 C.F.R. § 101.22(c) to place a statement of artificial flavoring on its product labels as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food.  Despite the fact that the artificial dual-use ingredient citric acid functions not only as a preservative but also as an artificial flavor in the Defendants' products, Defendants were required to disclose this function and place a statement to this effect on Defendants' products.  Citric acid meets the definition of an artificial flavor under California and federal law and does not meet the definition of a natural flavor under California and federal law.

37.  Defendants have also, *inter alia*, violated the Sherman Law, including California Health & Safety Code § 110740 because their products bear or contain artificial flavoring or chemical preservative without labeling stating that fact.

38.  Defendants have violated California Health & Safety Code § 110705 because words, statements, or other information required pursuant to the Sherman Law to appear on the label or labeling are not prominently placed upon the label or labeling with conspicuousness, as compared with other words, statements, designs, or devices in the labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

**Defendants' Labeling of the Misbranded Products As "Reduced Fat" Is False and/or Deceptive.**

39.  Defendants also falsely labels their "reduced fat" chips by failing to identify the reference food in immediate proximity to the "reduced fat" claim on the front label and comparing them to an inappropriate reference food.

40.  The FDA regulations require food manufacturers making "reduced fat" labeling claims to identify the reference food in immediate proximity to the most prominent "reduced fat" claim on the label.  *See* 21 C.F.R. §101.62(b)(4)(ii)(A).  However, Defendants do not do so.  As shown in the representative photo of Defendants' Reduced Fat Sea Salt Chips attached hereto in Addendum 3, the words "40% reduced fat" appear prominently in a green band across the middle of the brown bag.  The reference food does not appear in immediate proximity to this claim but, if

at all, at the bottom of the bag, where consumers will overlook it, especially because the bottoms of the bags crumple when stocked on store shelves, thus obscuring the comparative statement.  (*See ibid.*)  The placement of the reference food in a footnote—in direct violation of federal law—was intended to dupe consumers, who often make purchasing decisions based on front-of-the-package representations in a matter of seconds.

41.  Defendants' reduced-fat chips are not reduced in fat by the represented percentage because the comparison between kettle chips, a specific variety of potato chips, and regular potato chips, a category encompassing many different varieties of chips, is inappropriate and deceptive.

42.  The FDA requires manufacturers to identify the reference food in a way that is not misleading.  *See* 21 CFR § 101.13(j)(2)(i); 58 Fed. Reg. 2302–01, 2363 (Jan. 6, 1993).  According to the FDA, the company may be in violation of the reference-food regulations even if it has used the comparison language suggested by the FDA if the company exercises poor judgment in avoiding claims that are misleading because of their "overall context or presentation."  58 Fed.Reg. 2302-01, 2363 (Jan. 6, 1993).

43.  Under 21 CFR § 101.13(j)(1)(ii)(A) and (B), the reference food must be representative of "the type of food that includes the product that bears the claim."  That way, for example, "a manufacturer of Italian salad dressing cannot choose a particularly unhealthy formulation of Italian salad dressing as a comparator.  *See Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84, 94 (D.N.J. 2011).  Nor is it appropriate for a food manufacturer to compare a specific variety of food with the entire category into which it falls.  The FDA considers comparisons with a class of similar products to be misleading.[10]

44.  Defendants' reduced fat chips have regular Kettle Brand equivalents, and therefore consumers reasonably draw a comparison with Defendants' regular Kettle Brand potato chips,

---

[10]  *See* 56 FR 60445, 60448 (Nov. 27, 1991) ("The agency … does not consider … a similar product or class of similar products … to be an appropriate point of reference comparing 'reduced' foods.  Such a reference point reflects a much wider variety of products …  For example, if a product is labeled as 'reduced fat imitation bacon bits,' it is claiming that it contains reduced fat when compared to other imitation bacon bits.  If such a claim could be made on the basis of a data base of products similar to imitation bacon bits, that data base would likely include a range of products, including bacon.  The imitation bacon bits could have reduced fat when compared to the data base but not necessarily any less fat than other imitation bacon bit products.  In such circumstances, the claim would clearly be misleading.  Thus, FDA believes that comparison to a data base of similar products is not an appropriate basis for a 'reduced' claim.")

which are packaged in a bag almost identical to that of the Reduced Fat version, or to other brands of kettle chips. This understanding is reasonable because, as alleged above, kettle chips are distinct from regular potato chips in that they are batch cooked and not continuously processed and therefore differ in texture and taste. Many brands of chips, including Lays, an industry leader, make kettle chips as well as regular potato chips. Indeed, Lays came out with its own line of kettle chips *well before* Defendants launched their line of reduced-fat kettle chips. Consequently, any comparison between Kettle Brand's Reduced Fat chips and regular potato chips is inappropriate.

45. When compared to kettle chips as a type, Defendants' reduced-fat representations on their product labels are false and deceptive because their reduced-fat chips are not reduced in fat by the represented percentage. For example, Defendants' Reduced Fat Sea Salt Chips claim to be reduced in fat by 40 percent, but they are actually only reduced in fat by 33 percent. (Compare the nutritional information for Defendants' reduced-fat chips attached hereto in Addendum 4 with the nutrition information for Defendants' regular chips attached hereto in Addendum 2.)

46. The comparison with regular potato chips is a marketing tactic intended to dupe consumers, whom Defendants want to deceive into believing that Reduced Fat Kettle chips are lower in fat than regular Kettle Brand chips. There can be little doubt about this. In a press release introducing the reduced fat chips, the company characterized the line as "a new reduced fat potato chip that delivers signature bold flavor and hearty crunch, with 40 percent less fat." No comparison whatsoever is made to regular potato chips and the context clearly betrays a comparison with regular Kettle chips.

**Allegations as to the Named Plaintiff**

47. Plaintiff is and, throughout the entire class period, was a resident of the State of California. Through the class period Plaintiff has been concerned about and tries to avoid consuming foods that are not natural, such as foods containing synthetic, artificial or chemical ingredients, and tries to eat lower-fat or reduced-fat foods when possible. For this reason, Plaintiff is willing to pay and has paid a premium for foods that are natural and reduced fat and has endeavored to refrain from buying equivalent foods which are not natural and which do contain synthetic, artificial, or chemical ingredients, or that are higher in fat.

12

48. During the class period Plaintiff purchased, among other products, Kettle Brand Backyard Barbecue Potato Chips, Kettle Brand Sea Salt Chips, Kettle Brand Reduced Fat Sea Salt Chips, Kettle Brand Cheddar Beer Potato Chips, and Tias! Nacho Cheddar tortilla chips ("Purchased Products") from various markets throughout California, including but not limited to his local Ralphs supermarket in Encino, California, and a Walgreen drug store in San Francisco, California.

49. Before purchasing Kettle Brand Backyard Barbecue Potato Chips referred to above, Plaintiff read the following statements on the front and back of the packages: "absolutely nothing artificial," "A NATURAL OBSESSION," and "all natural potato chips," "great taste … naturally," "OUR NATURAL PROMISE," "Only all natural colors and flavors," "No preservatives," "Non-GMO ingredients," and "Real food ingredients," as well as the statement identified in paragraph 12 above.

50. Before purchasing Defendants' Kettle Brand Reduced Fat Sea Salt Chips, Plaintiff relied only upon the statement "40% reduced fat potato chips," which appeared in a large bright green band across the middle of the principal display panel.  (See photo attached in Addendum 3 hereto.)

51. Plaintiff relied on representations on the product label and believed that he was purchasing products that were all natural and free of synthetic or chemical ingredients, artificial flavoring, and food additives and, as to the Reduced Fat Sea Salt Chips, were reduced in fat by the stated percentage compared with Defendants' regular Sea Salt Chips or other regular kettle chips. Plaintiff ascribed value to these labeling representations and/or would not have purchased these products but for the identified representations and/or paid more money than he would have paid for other similar products that were not natural because they contained synthetic or artificial ingredients or were not reduced in fat as represented.  In this way, Plaintiff did not receive the natural and reduced-fat products he bargained for and has lost money as a result by purchasing Defendants' chips rather than some other product (or no other product) and/or paying a premium for Defendants' products because they were purportedly all natural and reduced in fat as represented.

52. On or around September 16, 2013, Plaintiff sent a letter to Diamond Foods informing it that it has engaged in unfair methods of competition and/or deceptive acts or practices, including but not limited to violation of California Civil Code § 1770, in connection with the sale

13

of the Misbranded Products, and requested that it correct, repair, replace, or otherwise rectify its unlawful conduct.  Diamond Foods responded by denying liability and declining to correct, repair, replace, or otherwise rectify its unlawful conduct.  Because more than 30 days have elapsed since the receipt of Plaintiff's letter, Plaintiff herein seeks seek actual, punitive, and statutory damages as appropriate on behalf of himself and similarly situated consumers, as well as equitable including injunctive relief.

## CLASS ALLEGATIONS

53. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following classes:

(a) All persons in the United States or, alternatively, California who purchased the Misbranded All-Natural Products from four years prior to the filing of the Complaint and continuing to the present.

(b) All persons in the United States or, alternatively, California who purchased the Misbranded Reduced-Fat Products from four years prior to the filing of the Complaint and continuing to the present.

54. The class excludes counsel representing the class, governmental entities, Defendants, any entity in which Defendants have a controlling interest, Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other putative class members.

55. Plaintiff reserves the right to amend or modify the class description with greater particularity or further division into subclasses or limitation to particular issues.

56. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and the class is easily ascertainable.

**A.     Numerosity**

57. The potential members of the class as defined are so numerous that joinder of all members of the class is impracticable.  Although the precise number of putative class members has not been determined at this time, Plaintiff is informed and believes that the proposed classes include thousands of members.

14

**B.    Common Questions Predominate**

58.  There are questions of law and fact common to the class that predominate over any questions affecting only individual putative class members.  Thus proof of a common set of facts will establish the right of each class member to recovery.  These common questions of law and fact include but are not limited to:

a.    Whether Defendants' conduct was a "fraudulent practice" within the meaning of the Unfair Competition Law ("UCL"), Business & Professions Code § 17200, in that it was likely to mislead consumers;

b.    Whether Defendants' conduct was an "unfair practice" within the meaning of the UCL in that it offended established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;

c.    Whether Defendants' conduct was an "unlawful" practice within the meaning of the UCL;

d.    Whether Defendants' conduct was likely to deceive a consumer acting reasonably in the same circumstances;

e.    Whether Defendants advertise or market the Misbranded Products in a way that is false or misleading;

f.    Whether Defendants violated California Business and Professions Code § 17500 et seq.;

g.    Whether Defendants violated California Civil Code § 1750 et seq.;

h.    Whether Plaintiff and members of the putative class are entitled to restitution, injunctive, declaratory and/or other equitable relief;

i.    Whether Defendants have been unjustly enriched through the misrepresentations alleged herein; and

j.    Whether Plaintiff and the members of the class sustained monetary loss.

**C.    Typicality**

59.  Plaintiff's claims are typical of the claims of the members of the putative classes because Plaintiff bought Defendants' Misbranded Products during the applicable class period.

15

Defendants' unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and each class member sustained similar injuries arising out of Defendants' conduct in violation of law. The injuries of each member of the class were caused directly by Defendants' wrongful conduct. In addition, the factual underpinning of Defendants' misconduct is common to all members of the putative class and represents a common thread of misconduct resulting in injury to all members of the class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the putative class and are based on the same legal theories.

**D.    Adequacy**

60. Plaintiff will fairly and adequately represent and protect the interests of the class. Counsel who represent Plaintiff and putative class members are experienced and competent in litigating class actions.

**E.    Superiority of Class Action**

61. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of putative class members is not practicable, and questions of law and fact common to putative class members predominate over any questions affecting only individual putative class members. Each putative class member has been damaged and is entitled to recovery by reason of Defendants' false labeling. Moreover, because the damages suffered by individual members of the class may be relatively small, the expense and burden of individual litigation would make it difficult of impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class-action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

62. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or equitable relief with respect to the class as whole.

63.  The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met because questions of law and fact common to each class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

64.  Plaintiff is unaware of any difficulties in managing this case that should preclude class action.

**FIRST CAUSE OF ACTION**

**Unlawful Business Practices in Violation of**

**Business and Professions Code § 17200, et seq.**

65.  Plaintiff incorporates by reference each allegation set forth above.

66.  Defendants' conduct constitutes unlawful business acts and practices under Business & Professions Code § 17200, et seq.

67.  Defendants sold Misbranded Products in California and throughout the United States during the class period.

68.  Defendant Diamond Foods is a corporation and, therefore, is a "person" within the meaning of the Sherman Food Drug & Cosmetic Law, California Health & Safety Code § 109875, et seq. (the "Sherman Law").  The Sherman Law adopts, incorporates—and is identical to—the federal Food, Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA").

69.  Defendants' business practices are unlawful under § 17200, et seq. by virtue of Defendants' violations of the advertising provisions of Article 3 of the Sherman Law and the misbranded food provisions of Article 6 of the Sherman Law.

70.  Defendants' business practices are unlawful under Business & Professions Code § 17200, et seq. by virtue of Defendants' violations of § 17500, et seq., which forbids untrue and misleading advertising.

71.  Defendants' business practices are unlawful under Business & Professions Code § 17200, et seq. by virtue of Defendants' violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.

///

17

72. Under California law, a food product that is misbranded cannot legally be manufactured, advertised, distributed, held or sold.  Misbranded products cannot be legally sold, possessed, have no economic value, and are legally worthless.  Indeed the sale, purchase, or possession of misbranded food is a criminal act in California and the FDA even threatens food companies with seizure of misbranded products.

73. Defendants sold Plaintiff and members of the putative class Misbranded Products that were not capable of being sold or legally held and which had no economic value and were legally worthless.  Plaintiff and each putative class member paid a premium price for the Misbranded Products.

74. As a result of Defendants' illegal business practices, Plaintiff and the members of the putative class are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any putative class member any money paid for the Misbranded Food Products.

75. Defendants' unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and each member of the putative class.

**SECOND CAUSE OF ACTION**

**Unfair Business Practices in Violation of**

**Business & Professions Code § 17200, *et seq.***

76. Plaintiff incorporates by reference each allegation set forth above.

77. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

78. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

79. Defendants' conduct as set forth herein constitutes unfair business acts and practices.

///

1        80.  Defendants sold Misbranded Products in California and throughout the United

2   States during the class period.

3        81.  Plaintiff and the members of the putative class suffered a substantial injury by virtue

4   of buying Defendants' Misbranded Products, which they would not have purchased absent

5   Defendants' illegal conduct.

6        82.  Defendants' deceptive marketing, advertising, packaging and labeling of their

7   Misbranded Products and their sale of unsalable misbranded products that were illegal to possess

8   were of no benefit to consumers, and the harm to consumers and competition is substantial.

9        83.  Defendants sold Plaintiff and the members of the putative class Misbranded

10  Products that were not capable of being legally sold or held and that had no economic value and

11  were legally worthless.  Plaintiff and the members of the putative class paid a premium price for the

12  Misbranded Products.

13       84.  Plaintiff and the members of the putative class who purchased Defendants'

14  Misbranded Products had no way of reasonably knowing that the products were misbranded and

15  were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably

16  avoided the injury each of them suffered.

17       85.  The consequences of Defendants' conduct as set forth herein outweigh any

18  justification, motive or reason therefor.  Defendants' conduct is and continues to be unlawful,

19  unscrupulous and contrary to public policy, and is substantially injurious to Plaintiff and the

20  members of the putative class.

21       86.  As a result of Defendants' conduct, Plaintiff and the members of the putative class,

22  pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future

23  conduct by Defendants, and such other orders and judgments which may be necessary to disgorge

24  Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Products by

25  Plaintiff and the members of the putative class.

26  ///

27  ///

28  ///

19

1

### THIRD CAUSE OF ACTION

2

**Fraudulent Business Practices in Violation of**

3

**Business and Professions Code § 17200, *et seq.***

4          87.  Plaintiff incorporates by reference each allegation set forth above.

5          88.  Defendants' conduct as set forth herein constitutes fraudulent business practices

6    under California Business and Professions Code sections § 17200, *et seq.*

7          89.  Defendants sold Misbranded Products in California and throughout the United

8    States during the class period.

9          90.  Defendants' misleading marketing, advertising, packaging, and labeling of the

10   Misbranded Products and misrepresentation that the products were capable of sale, capable of

11   possession, and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiff

12   and the members of the putative class were deceived.  Defendants have engaged in fraudulent

13   business acts and practices.

14         91.  Defendants' fraud and deception caused Plaintiff and the members of the putative

15   class to purchase Defendants' Misbranded Products that they would otherwise not have purchased

16   had they known the true nature of those products.

17         92.  Defendants sold Plaintiff and the members of the putative class Misbranded

18   Products that were not capable of being sold or legally held and that had no economic value and

19   were legally worthless.  Plaintiff and the members of the putative class paid a premium price for the

20   Misbranded Products.

21         93.  As a result of Defendants' conduct as set forth herein, Plaintiff and each member of

22   the putative class, pursuant to Business and Professions Code § 17203, are entitled to an order

23   enjoining such future conduct by Defendants, and such other orders and judgments which may be

24   necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants'

25   Misbranded Products by Plaintiff and the members of the putative class.

26   ///

27   ///

28   ///

20

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

# FOURTH CAUSE OF ACTION

## Misleading Advertising in Violation of

## Business and Professions Code § 17500, *et seq.*

94.  Plaintiff incorporates by reference each allegation set forth above.

95.  Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500, *et seq.*, for misleading and deceptive advertising against Defendants.

96.  Defendants sold Misbranded Products in California and throughout the United States during the class period.  Defendants engaged in a scheme of offering Defendants' Misbranded Products for sale to Plaintiff and the members of the putative class by way of product packaging and labeling.  These materials misrepresented and/or omitted the true contents and nature of Defendants' Misbranded Products.

97.  Defendants' advertisements and inducements were made within California and throughout the United States and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.*, in that such product packaging and labeling were intended as inducements to purchase Defendants' Misbranded Food Products and are statements disseminated by Defendants to Plaintiff and the members of the putative class that were intended to reach the members of the putative class.  Defendants knew, or in the exercise of reasonable care should have known, that these statements were misleading and deceptive as set forth herein.

98.  In furtherance of its plan and scheme, Defendants prepared and distributed within California and nationwide via product packaging and labeling statements that misleadingly and deceptively represented the composition and the nature of Defendants' Misbranded Products.  Plaintiff and members of the putative class necessarily and reasonably relied on Defendants' materials and were the intended targets of such representations.

99.  Defendants' conduct in disseminating misleading and deceptive statements in California and nationwide to Plaintiff and the members of the putative class was and is likely to deceive reasonable consumers by obfuscating the true composition and nature of Defendants' Misbranded Products, in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

21

100. As a result of Defendants' violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiff and the members of the putative class. Misbranded products cannot be legally sold or held and have no economic value and are legally worthless. Plaintiff and the members of each Class paid a premium price for the Misbranded Products.

101. Plaintiff and the members of the putative class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the members of the putative class.

## FIFTH CAUSE OF ACTION

### Untrue Advertising in Violation of

### Business and Professions Code § 17500, *et seq.*

102. Plaintiff incorporates by reference each allegation set forth above.

103. Plaintiff asserts this cause of action against Defendant for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising. Defendants sold Misbranded Products in California and throughout the United States during the class period.

104. Defendants engaged in a scheme of offering Defendants' Misbranded Products for sale to Plaintiff and the members of the putative class by way of product packaging and labeling. These materials misrepresented and/or omitted the true contents and nature of Defendants' Misbranded Products. Defendants' advertisements and inducements were made in California and throughout the United States and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.*, in that the product packaging and labeling were intended as inducements to purchase Defendants' Misbranded Product and are statements disseminated by Defendants to Plaintiff and the members of the putative class. Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue.

105. In furtherance of its plan and scheme, Defendants prepared and distributed in California and nationwide via product packaging and labeling statements that falsely advertise the

composition of Defendants' Misbranded Products, and falsely misrepresented the nature of those products. Plaintiff and the members of the putative class were the intended targets of such representations and would reasonably be deceived by Defendants' materials.

106. Defendants' conduct in disseminating untrue advertising throughout California deceived Plaintiff and the members of the putative class by obfuscating the contents, nature, and quality of Defendants' Misbranded Products, in violation of the "untrue prong" of California Business and Professions Code § 17500.

107. As a result of Defendants' violations of the "untrue prong" of California Business and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiff and the members of the putative class. Misbranded products cannot be legally sold or held and have no economic value and are legally worthless. Plaintiff and the members of the putative class paid a premium price for the Misbranded Products.

108. Plaintiff and the members of the putative class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the members of the putative class.

**SIXTH CAUSE OF ACTION**

**Violation of the Consumers Legal Remedies Act,**

**California Civil Code §§ 1750,** *et seq.*

109. Plaintiff incorporates by reference each allegation set forth above.

110. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (the "CLRA").

111. Plaintiff and each member of the putative class are "consumers" within the meaning of Civil Code § 1761(d).

112. The purchases of the Defendants' Misbranded Products by consumers constitute "transactions" within the meaning of Civil Code § 1761(e), and the Misbranded Products offered by Defendants constitute "goods" within the meaning of Civil Code § 1761(a).

113. Defendants have violated, and continue to violate, the CLRA in at least the following respects:

    a.   In violation of Civil Code § 1770(a)(5), Defendants represented that the Misbranded Products had characteristics which they did not have;

    b.   In violation of Civil Code § 1770(a)(7), Defendants represented that the Misbranded Products were of a particular standard, quality, or grade, of which they were not; and

    c.   In violation of Civil Code § 1770(a)(9), Defendants advertised the Misbranded Products with the intent not to provide what it advertised.

114. As a direct and proximate cause of Defendants' violation of the CLRA as alleged hereinabove, Plaintiff and members of the putative class have suffered damages, including but not limited to inducing them to purchase the Misbranded Products and pay a premium therefor where such products did not conform to Defendants' representations, thereby causing Plaintiff and putative class members to incur a pecuniary loss.

115. Pursuant to California Civil Code § 1780, Plaintiff, on behalf of himself and the putative class, seeks damages, restitution, injunctive relief, punitive damages, attorneys' fees, and the costs of litigation.

**SEVENTH CAUSE OF ACTION**
**Restitution Based On Quasi-Contract/Unjust Enrichment**

116. Plaintiff incorporates by reference each allegation set forth above. Plaintiffs plead this cause of action in the alternative.

117. Defendants' conduct in enticing Plaintiff and putative class members to purchase the Misbranded Products through their false and misleading advertising and packaging as described throughout this Complaint is unlawful because the statements contained on Defendants' product labels are untrue. Defendants' took monies from Plaintiff and members of the putative class for products promised to be "natural" or "all natural" (or words of similar import) and reduced in fat by stated percentages, even though the Misbranded Products did not conform to these representations.

118. Defendants have been unjustly enriched at the expense of Plaintiff and the putative class as result of Defendants' unlawful conduct alleged herein, thereby creating a quasi-contractual

24

1   obligation on Defendants to restore these ill-gotten gains to Plaintiff and putative class members.

2       119.  As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and

3   putative class members are entitled to restitution or restitutionary disgorgement, in an amount to be

4   proved at trial.

5                           **PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the

7   putative class, prays as follows:

8       A.      For an order certifying that this action is properly brought and may be maintained as

9   a class action, that Plaintiff be appointed the Class Representative, and that Plaintiff's counsel be

10  appointed counsel for the class;

11      B.      For restitution in such amount that Plaintiff and all putative class members paid to

12  purchase the Misbranded Products, the premiums paid therefor, value ascribed thereto on account

13  of the misrepresentation as alleged above, and/or restitutionary disgorgement of the profits

14  Defendants have obtained from those transactions;

15      C.      For compensatory damages for causes of action for which they are available;

16      D.      For statutory damages allowable under Civil Code § 1780;

17      E.      For punitive damages for causes of action for which they are available;

18      F.      For a declaration and order enjoining Defendants from advertising their products

19  misleadingly in violation of California's Sherman Food, Drug, and Cosmetic Law, and other

20  applicable laws and regulations as specified in this Complaint;

21      G.      For an order awarding reasonable attorneys' fees and the costs of suit herein;

22      H.      For an award of pre- and post-judgment interest;

23      I.      For an order requiring an accounting for, and imposition of, a constructive trust upon

24  all monies received by Defendants as a result of the unfair, misleading, fraudulent and unlawful

25  conduct alleged herein; and

26      J.      Such other and further relief as may be deemed necessary or appropriate.

27  ///

28  ///

1

Respectfully submitted,

2    DATED:        August 15, 2014                    COUNSELONE, PC

3

4                                                     By _____

5                                                        Anthony J. Orshansky
                                                         Justin Kachadoorian
6                                                        Attorneys for Plaintiff RICHARD HALL
                                                         and the Putative Class

7

8                                          **JURY DEMAND**

9

10        Plaintiff hereby demands a jury trial on all issues so triable.

11

12   DATED:        August 15, 2014                    COUNSELONE, PC

13

14                                                    By _____

15                                                       Anthony J. Orshansky
                                                         Justin Kachadoorian
16                                                       Attorneys for Plaintiff RICHARD HALL
                                                         and the Putative Class

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 3:14-CV-02148-MMC

Addendum 1

**Addendum 1 – Misbranded Products**

*Kettle Chips*

Fully Loaded Baked Potato

Sweet Onion

Sea Salt & Vinegar

Spicy Thai

Backyard Barbeque

Honey Dijon

New York Cheddar

Sour Cream & Onion

Cheddar Beer

Jalapeño Jack

Maple Bacon

Jalapeño

*Krinkle Cut Chips*

Zesty Ranch

Cheddar & Sour Cream

Buffalo Bleu

Classic Barbeque

Salt & Fresh Ground Pepper

*Reduced Fat Chips*

Sea Salt & Vinegar

Salt & Fresh Ground Pepper

*Bakes Chips*

Sea Salt & Vinegar

Hickory Honey Barbeque

Cheddar & Roasted Tomato

Sour Cream and Onion

*Organic Chips*

Country Style Barbecue

Sweet Chili Garlic

*Tias!*

Nacho Cheddar

Zesty Ranch

Sweet Baja Barbecue

Chili con Queso

Salsa Picante

Addendum 2



## OUR NATURAL PROMI

🌿 0 grams trans fat

🌿 Only all natural colors and fl

🌿 Only natural oils

🌿 No preservatives

🌿 Non-GMO ingredients

🌿 Gluten free

🌿 Real food ingredients



# Nutrition Facts

Serving Size 1 oz (28g/about 13 chips)

Servings Per Container: 5

| Amount Per Serving | |
|---|---|
| Calories 150 | Calories from Fat 80 |

| | % Daily Value* |
|---|---|
| Total Fat 9g | 14% |
| Saturated Fat 1g | 5% |
| Trans Fat 0g | |
| Polyunsaturated Fat 1g | |

**Ingredients:** Potatoes, safflower and/or sunflower oil, honey powder (dried cane syrup, honey), rice flour, sugar, salt, onion powder, yeast extract, tomato powder, paprika, torula yeast, garlic powder, chili pepper, citric acid, cayenne pepper, paprika extract (color), natural cheese flavor.

bold flavor and hearty crunch

They taste so great because they're all natural, real food ingredients, all natural potatoes, natural oils and craft cooking methods.

And they're backed by a commitment to sustainability like wind power, solar power, green building and biodiesel.

Kettle Brand® Potato Chips: Great tasting & all natural potato chips from a company that cares.

WWW.KETTLEBRA



These Backyard Barbeque® chips have bold flavor and hearty crunch.

They taste so great because they're made from all natural, real food ingredients, the finest potatoes, natural oils and craft cooking methods.

And they're backed by a commitment to sustainability like wind power, solar power, green building and biodiesel.

Kettle Brand® Potato Chips: simply the best tasting, all natural potato chips made by a company that cares.



Addendum 3



Addendum 4



Kettle Brand® Reduced Fat Potato Chips  5 g fat*
Regular Potato Chips
* per serving                                 9 g fat*

Ingredients: Potatoes, safflower and/or
sunflower and/or canola oil, sea salt.

## Nutrition Facts
Serving Size 1 oz (28g/about 13 chips)
Servings Per Container: about 2

| Amount Per Serving | 1 oz | 1 Bag |
|---|---|---|
| Calories | 130 | 240 |
| Calories from Fat | 50 | 90 |

| | % Daily Value* | |
|---|---|---|
| Total Fat 6g, 10g | 9% | 15% |
| Saturated Fat 0.5g, 1g | 3% | 5% |
| Trans Fat 0g, 0g | | |
| Polyunsaturated Fat 1g, 1g | | |
| Monounsaturated Fat 4.5g, 8g | | |
| Cholesterol 0mg, 0mg | 0% | 0% |
| Sodium 160mg, 280mg | 7% | 12% |
| Potassium 480mg, 860mg | 14% | 25% |
| Total Carbohydrate 19g, 33g | 6% | 11% |
| Dietary Fiber 1g, 2g | 4% | 8% |
| Sugars 0g, 0g | | |
| Protein 2g, 4g | | |

| | | |
|---|---|---|
| Vitamin A | 0% | 0% |
| Vitamin C | 10% | 20% |
| Calcium | 0% | 0% |
| Iron | 2% | 2% |

*Percent Daily Values are based on a 2,000
calorie diet. Your daily values may be higher.

K

Po

These Se
and hear
Fat.

They tas
made    fr
ingredien
oils and c

And they
sustainab
power, gr

Kettle Bra
tasting,  a
by a comp

WWW

OUR N